UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| MEHRDAD HOSSEINI,<br>    Plaintiff,<br><br>V.<br><br>ELAINE C. DUKE, *et al.*,[1]<br>    Defendants. | CIVIL ACTION NO. 5:14-404-KKC<br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Plaintiff Mehrdad Hosseini's motion for summary judgment. (DE 24). For the reasons explained below, the Court denies Plaintiff's motion for summary judgment and affirms USCIS's decision denying Hosseini's adjustment of status application.

**I. Background**

In May 1999, Hosseini's wife, an Iranian citizen, and their two children were granted asylum by an Immigration Judge (IJ). (DE 21-1, at 114, 122-23). In her affidavit supporting her asylum application, Hosseini's wife stated that her fear of persecution and prosecution were based, in part, on the arrest of Hosseini by the Iranian Revolutionary Guard for his past anti-revolutionary activities with the Mujahadin-e Khalq Organization ("MeK").[2] (DE 21-1, at 124-27). Hosseini's wife described his involvement with the MeK during the 1980s as "minimal, occasional, and [] mostly in the form of providing copying and telefax services to

---

[1] At the time that Plaintiff filed his Motion for Summary Judgment the named Defendant in this case was Secretary of Homeland Security John F. Kelly. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as the named defendant Elaine C. Duke, acting Secretary of Homeland Security. *See* Elaine C. Duke, U.S. Department of Homeland Security (Aug. 8, 2017), https://www.dhs.gov/person/elaine-c-duke.
[2] There are multiple spellings and names used for the MeK in the record for this proceeding, including mojahedin, mujahedeen, and MEK. The Court will use the abbreviation MeK unless a quoted source uses a different spelling or name.

1

facilitate distribution of political leaflets and articles at the request of his brothers who were active in the organization." (DE 21-1, at 127).

Because Hosseini was not in the United States at the time of his wife's asylum application, he was not a party to those proceedings. Instead, shortly after her application was granted, Hosseini's wife submitted a Form I-730 Refugee/Asylee Relative Petition seeking asylum status for Hosseini as a derivative beneficiary spouse. (DE 21-1, at 111-13); *see* 8 U.S.C. § 1158(b)(3)(A) ("A spouse . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if . . . following to join, such alien."). Hosseini's derivative beneficiary application was granted by a U.S. Citizenship and Immigration Services ("USCIS") adjudicator on December 1, 1999. The adjudicator, however, did not review Hosseini's wife's file and did not interview Hosseini or his wife. (DE 21-1, at 5).[3] After his wife's application was granted, Hosseini claims he appeared at the U.S. consul in the United Arab Emirates where he executed an application to enter the United States, in which he stated that he was never affiliated with a foreign terrorist organization ("FTO"). [4] (DE 18, at ¶ 40).

A little more than one year after entering the United States as an asylee, Hosseini filed a Form I-485 application to adjust his status to a lawful permanent resident on April 19,

---

[3] Hosseini claims in his briefing that there is no evidence on the record that supports USCIS's claim that the adjudicator did not review his wife's file. Hosseini's From I-730, however, contains a notation by Immigration Naturalization Service which states "unable to review [principle applicant's] file." DE 21-1, at 111-13).

[4] In their answer, Defendant's state that they lack sufficient knowledge to admit or deny Hosseini's allegation that he appeared at the U.S. consul and executed an application to enter the United States prior to his arrival in January 2000. Hosseini's briefing is inconsistent about whether he was interviewed by a consular officer prior to his admission into the United States. In his Motion for Summary Judgment, Hosseini states that he was interviewed and cites the Foreign Affairs Manual in support of this claim. (DE 24, at 5); *see* U.S. Dep't of State, Foreign Affairs Manual 9 FAM 203.6-2(d), https://fam.state.gov/FAM/09FAM/09FAM020306.html. ("In countries where USCIS has no presence, consular officers are responsible for interviewing the beneficiaries of Form I-730s to verify the identity and the relationship to the petitioner, as well as determining if any inadmissibilities or bars to derivative asylum or refugee status exist."). In his reply brief, however, Hosseini states that USCIS "never, not once, interview[ed] him." (DE 27, at 7). For the purpose of this opinion, the Court will accept the claim in Hosseini's Motion for Summary Judgement that he was interviewed by a consular officer.

2001. (DE 21-1, 91-94). In that application, Hosseini stated that he joined "a political organization called Fadaeian Khalgh [sic] from 1979 to 1982 in Iran."[5] (DE 21-1, at 92). More than six years after submitting his status adjustment application, Hossieni received a request for evidence from USCIS noting the discrepancy between his wife's asylum file, which indicated membership with the MeK, and his Form I-485, which only listed membership in the FeK. USCIS requested that Hosseini submit an affidavit explaining the discrepancy, and indicating all groups with which he had been involved. (DE 21-1, at 71-72).

In his affidavit, Hosseini stated that he "began reading and distributing literature from various sources, two of which were from MEK and the Fadaian." (DE 21-1, at 49). He claimed that the literature "exposed the [Iranian] government's oppressive actions throughout the country, particularly the crack-down on demonstrations by women, students, workers, and the corruption in government that led to waste and inefficiency." (DE 21-1, at 49-50). He stated that he had heard "rumors" that the MeK and other groups had engaged in terrorist attacks, but claimed that the information was unreliable at the time due to misinformation spread by the Irian government. (DE 21-1, at 50). He claimed that while he distributed literature, he was never affiliated with or a member of the MeK (DE 21-1, at 45). He stated that he ceased distributing political literature in 1985 due to his fear of persecution for being a member of an opposition group. (DE 21-1, at 53). And, finally, he claimed that he was never a member of the FeK, although he supported their political goals and attended their meetings. (DE 21-1, at 54).

Hosseini's application went unadjudicated for another six years and, in March 2013, he filed a *pro se* complaint in federal district court seeking to compel USCIS to decide his

---

[5] Hosseini's application misspelled the name of the organization—the Fedayeen Khalq. Other spellings used in the record included Fedaian, Fadaian and Fadayan. The Court will use the abbreviation FeK unless quoting a source.

3

application. The court issued an order on April 3, 2014 requiring USCIS to adjudicate Hosseini's application within 60 days. *Hosseini v. Napolitano*, 12 F. Supp. 3d 1027 (E.D. Ky. 2014). On May 5, 2014, USCIS issued a notice of intent to deny Hosseini's application to adjust status on the basis that he was inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) because his distribution of literature for the FeK and MeK constituted engaging in terrorist activities under § 1182(a)(3)(B)(iv)(VI)(dd). (DE 21-1, at 36-38). Hosseini filed a timely response to the notice of intent to deny, arguing that he was not inadmissible because he was not a member of the FeK or MeK, he lacked knowledge of their terrorist activities, and his actions did not constitute material support of the organizations. He also argued that USCIS was collaterally estopped from denying his application because of its previous finding that he was an admissible asylee. (DE 21-1, at 7-11). On July 18, 2014, a decision was entered addressing Hosseini's response and denying his application for permanent resident status. (DE 21-1, at 2-6).

Hosseini filed the present action seeking review of USCIS's denial of his legal permanent residence application on October 28, 2014. The Sixth Circuit determined that this Court has subject matter jurisdiction over Hosseini's claim and that USCIS's denial of Hosseini's application was a "final agency action" within the meaning of the Administrative Procedure Act ("APA"). *Hosseini v. Johnson*, 826 F.3d 354 (6th Cir. 2016). Hosseini filed a motion for summary judgement on February 1, 2017 (DE 24) that is now ripe for review.

**II. Standard of Review**

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, review of a final agency action is limited to whether the

4

decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[6] 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary or capricious when:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007) (quoting *Motor Vehicles Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). An agency action is not in accordance with the law "when it is in conflict with the language of the statute relied upon by the agency." *Id.* The scope of this standard of review is narrow and the Court is not permitted to substitute its judgment for the agency's expertise. *State Farm*, 463 at 43.

## III. Analysis

USCIS determined that Hosseini was not eligible for an adjustment of status because he was not admissible at the time of his application. 8 U.S.C. § 1159(b)(5) ("The Secretary of Homeland Security . . . may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who . . . (5) is admissible . . . as an immigrant under this chapter at the time of examination for adjustment of such alien."). The classes of inadmissible aliens are set forth in 8 U.S.C. § 1182. Hosseini was found to be

---

[6] Defendants argue that the correct standard of review is substantial evidence. The APA, however, only prescribes substantial evidence review in cases where an administrative hearing is required. 5 U.S.C. § 706(2)(E) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute . . . ."); *see* 5 U.S.C. § 556(a) ("This section applies, according to the provisions thereof, to hearings required by section 553 or 554 of this title . . . ."). Defendant claims that Supreme Court and Sixth Circuit precedent make it clear that the Court should apply substantial evidence review. Neither case Defendant cites, however, supports this argument. In *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989), the Court applied arbitrary and capricious review to the decision of the Corps of Engineers not to prepare supplemental environmental impact statements. *Id.* at 375-76 ("We conclude that review of the narrow question before us whether the Corps' determination that the FEISS need not be supplemented should be set aside is controlled by the 'arbitrary and capricious' standard of § 706(2)(A)."). In *Steeltech, Ltd. v. U.S. E.P.A*, 273 F.3d 652 (6th Cir. 2001), the Sixth Circuit applied the substantial evidence standard because an administrative hearing on the record was required. *Id.* at 654, 657. Because an administrative hearing on the record is not required for adjustment of status applications, the substantial evidence standard of § 706(2)(E) is inapplicable. *See* 8 C.F.R. § 209.2 (specifying the procedure for adjustment of status by an asylee).

5

inadmissible as an alien who "has engaged in a terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(i)(I). More specifically, USCIS determined that Hosseini "engage[d] in terrorist activity" by committing "an act that the actor knows, or reasonably should know, affords material support . . . to a terrorist organization." § 1182(a)(3)(B)(iv)(VI)(dd). USCIS found the MeK and FeK to be "Tier III" or "undesignated" FTOs, defined as "a group of two or more individuals whether organized or not, which engages in, or has a subgroup which engages in" terrorist activities, § 1182(a)(3)(B)(vi)(III), and determined that Hosseini's act of distributing literature on their behalf constituted providing material support.

Hosseini makes four principal arguments in support of his motion for summary judgment. First, that USCIS was collaterally estopped from reaching a second conclusion on inadmissibility that was contrary to the first. Second, that USCIS's determination that the MeK and FeK were engaged in terrorist activities was arbitrary and capricious. Third, that Hosseini presented clear and convincing evidence that he did not know, and should not have known, that the MeK and FeK were engaged in terrorist activities. And fourth, the alleged support that Hosseini provided to the MeK and FeK was not "material." These arguments and their subparts are addressed in turn.

*A. Collateral estoppel did not apply to Hosseini's adjustment of status application*

Hosseini's first argument is that USCIS was collaterally estopped from finding that he was inadmissible based on its prior decision granting him asylum status. Collateral estoppel, also known as issue preclusion, "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Migra v. Warren City School Dist. Bd. Of Educ.*, 465 U.S. 75, 77 n.1 (1984) (citing Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982)). The doctrine of collateral estoppel has been extended to administrative agencies when they act in a judicial capacity. *See United States v. Utah Const. & Min. Co.*, 384 U.S. 394, 421 (1966) ("When an administrative agency is acting in a judicial capacity and resolved

6

disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."). The purpose of applying collateral estoppel to final agency determinations is "the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Collateral estoppel applies to an agency adjudication if the following four conditions are satisfied:

1) the precise issued raised in the present case must have been raised and actually litigated in the prior proceeding;

2) determination of the issue must have been necessary to the outcome of the prior proceeding;

3) the prior proceeding must have resulted in a final judgment on the merits; and

4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Bilali v. Gonazales*, 502 F.3d 470, 474 (6th Cir. 2007) (citing *United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003).

Hosseini's asylum application does not meet the first condition required for collateral estoppel: that the precise issue raised in the present proceeding was raised and actually litigated in the prior proceeding. This prong of the collateral estoppel test is unsatisfied for two reasons.

First, Hosseini's involvement with the FeK was not raised during his asylum application. Hosseini did not reveal his involvement with the FeK until he submitted his status adjustment application. USCIS noted this discrepancy when it requested additional information from Hosseini in 2007 (DE 21-1, at 72). Hosseini does not claim to have revealed his involvement with the FeK when applying for a visa at the U.S. consulate, but instead

7

admits in his affidavit that USCIS was not aware of his FeK involvement until his status adjustment application was filed (DE 21-1, at 52). Hosseini's failure to disclose this involvement prevented the USCIS adjudicator and consular officer from assessing whether he was inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) based on his FeK activities.

Second, whether Hosseini was inadmissible was not actually litigated during his asylum application. In order for an issue to be actually litigated, the prior proceedings must have been adversarial and adjudicative in nature. Otherwise, the purposes of collateral estoppel, ensuring that successful litigants are not burdened with multiple claims and preserving adjudicatory resources, are not served. *See Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 107-108 (explaining that collateral estoppel is meant to avoid "impos[ing] unjustifiably upon those who have already shouldered their burdens, and drain[ing] the resources of an adjudicatory system with disputes resisting resolution.").

Hosseini was not a party to his wife's asylum application. Instead, Hosseini's wife sought asylum status for him as a derivative beneficiary spouse after her application was granted. The record indicates that Hosseini's asylum application was reviewed and decided by a USCIS adjudicator and his visa application by a consular officer in the United Arab Emirates. Hosseini has not shown that either of these applications was adversarial or adjudicative in nature. *See Cospito v. Attorney General U.S.*, 539 F.3d 166, 171 (3d Cir. 2008) (holding that an adjustment of status application was non-adjudicative for the purposes of collateral estoppel where it was conducted by an agency official rather than an IJ); *Andrade v. Gonzales*, 459 F.3d 538, 545 (5th Cir. 2006) (same); *Mugomoke v. Hazuda*, No. 13–CV–00984–KJM–KJN, 2014 WL 4472743, at *9 (E.D. Cal. Sept. 11, 2014) (holding that an asylum interview before an asylum officer was non-adversarial and not entitled to collateral estoppel). Thus, because the issue of whether Hosseini provided material support to the FeK

was not raised during his asylum proceedings and those proceedings were non-adjudicative in nature, the first condition required for collateral estoppel has not been fulfilled.

Hosseini relies on the Fifth Circuit's decision in *Amrollah v. Napolitano*, 710 F.3d 568 (5th Cir. 2013), to claim that collateral estoppel should apply. That case is distinguishable. First, the petitioner in *Amrollah* had his asylum application adjudicated in a hearing before an IJ and therefore the issue of his admissibility was actually litigated in a judicial-like proceeding. *Id.* at 570. Second, Amrollah's asylum application and legal permanent residence application were decided on the same facts—his activities supporting the MeK. Hosseini, however, revealed new information regarding his involvement with a second FTO, the FeK, in his application for adjustment of status that was not revealed during his asylum application.[7]

Hosseini concedes in his reply brief that collateral estoppel may not directly apply because his asylum application was not before an IJ. Instead, he attempts to recharacterize this claim as an arbitrary and capricious challenge because USCIS decided the same issue differently based on the same facts. This argument is unavailing. Even assuming the Court should apply the presumption of administrative regularity and disregard USCIS's claim that Hosseini's asylum adjudicator was unable to review his wife's file, USCIS did not decide the issue of admissibility on the same facts. As discussed above, Hosseini failed to disclose his FeK involvement during the asylum application process and therefore, even if the USCIS adjudicator had access to his wife's file, that fact would not have been before the adjudicator.

---

[7] In *Amrollah*, the Fifth Circuit addressed the question of whether the significant change in law exception to collateral estoppel applied. The court found that the passage of the USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2011), was not a significant change in the law and therefore collateral estoppel was not precluded. *Amrollah*, 710 F.3d at 573. Like the plaintiff in *Amrollah*, Hosseini's asylum application was decided under the 1999 Immigration and Nationality Act ("INA") and his status adjustment application was decided following the 2001 revision. Because the Court finds that the four-prong test for collateral estoppel was not met, the Court declines to address the issue of whether the 2001 revision to the INA constituted a significant change in law.

Hosseini's subsequent disclosure of his involvement with the FeK constituted changed circumstances obviating any claim that the inconsistent decisions were arbitrary and capricious.

*B. USCIS's determination that the MeK and FeK were engaged in terrorist activities at the time when Hosseini provided material support was not arbitrary or capricious*

Plaintiff's second argument is that USCIS's determination that the MeK and FeK were undesignated FTOs was arbitrary and capricious. The INA defines "terrorist organization" to include three tiers of groups: (i) a Tier I organization designated by the Secretary of State pursuant to 8 U.S.C. § 1189; (ii) a Tier II organization designated, upon publication in the Federal Register, by the Secretary of State after consulting with the Attorney General or Secretary of Homeland Security; and (iii) a Tier III organization "that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in" terrorist activities. 8 U.S.C. § 1182(a)(3)(B)(vi)(I)-(III). USCIS found that the violent activities of the FeK and MeK fell within the definition of a Tier III, or undesignated FTO.[8] (DE 21-1, at 4). As discussed below, neither of these determinations was arbitrary or capricious.

1. *The Mujahadin-e Khalq Organization*

In assessing whether the MeK engaged in terrorist activities, USCIS cited the United States Department of State's 2007 Country Reports on Terrorism, which describes the group's activities during the 1970s and 1980s as follows:[9]

---

[8] The MeK was designated a Tier I FTO in 1997, but USCIS did not rely on this designation in its denial of Hosseini's adjustment of status application. In September 2012, the MeK was removed from the list of Tier I FTOs, but the removal did not have a retroactive effect. (DE 21-1, at 3). The FeK has never been designated a Tier I or Tier II FTO.

[9] In *Daneshvar v. Ashcroft*, 355 F.3d 615 (6th Cir. 2004), the Sixth Circuit upheld the Board of Immigration Appeals' determination that the MeK was a Tier III terrorist organization during the 1970s. *Id.* at 627. The court of appeals, however, did not address MeK activities during the 1980s.

> During the 1970s, the MEK assassinated several U.S. military personnel and U.S. civilians working on defense projects in Tehran and supported the violent takeover in 1979 of the U.S. Embassy in Tehran.
>
> In 1981, MEK leadership attempted to overthrow the newly installed Islamic regime; Iranian security forces subsequently initiated a crackdown on the group. The MEK instigated a bombing campaign, including an attack against the head office of the Islamic Republic Party and the Prime Minister's office, which killed some 70 high-ranking Iranian officials, including Chief Justice Ayatollah Mohammad Beheshti, President Mohammad-Ali Rajaei, and Prime Minister Mohammad-Javad Bahonar. These attacks resulted in a popular uprising against the MEK and an expanded Iranian government crackdown which forced MEK leaders to flee to France.

U.S. Dep't of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2007*, at 293 (Apr. 2008). USCIS also relied on the Library of Congress Country Studies on Iran, which documented the MeK's attempt in September 1981 to trigger an uprising by sending its young, armed supporters to demonstrate and confront government authorities. Fed. Research Div., Library of Cong., *Iran: A Country Study* 64 (Glen E. Curtis & Eric Hooglund eds., 5th ed 2008). Additionally, the MeK used machine guns and rocket-propelled grenade launchers against the Revolutionary Guard on September 27, 1981. (DE 21-1, at 4).

Hosseini asserts that USCIS improperly determined that the "iteration" of the MeK that Hosseini distributed literature on behalf of was the same as the group that committed the attacks described above. He first argues that the record does not support USCIS's determination that he was distributing MeK fliers between 1979 to 1981, when the terrorist activities described above took place. While Hosseini did not specify the date on which he began distributing MeK literature in his affidavit, USCIS's determination that he was distributing literature during this period is supported by evidence on the record. Hosseini's wife stated in her affidavit that her "husband and his brothers were politically active in the Mojahedin organization whose aim after the 1979 revolution was to overthrow the Islamic regime" and that "his association and involvement with the Mojahedin organization"

occurred in the "80's." (DE 21-1, at 125, 127). And in his affidavit, Hosseini describes how, "in the months immediately after the fall of the Shah," organizations such as the MeK and FeK were distributing literature. In the next paragraph, he states that he "began reading and distributing literature from . . . [the] MEK." (DE 21-1, at 49). Hosseini does not indicate that the events described in these two paragraphs were separated by a significant length of time, much less a gap of three years. Thus, the record evidence supports USCIS's determination that Hosseini's distribution of MeK literature began between 1979 and 1981, shortly after the fall of the Shah. There is no evidence on the record that supports Hosseini's claim that his MeK activities began only after the crack-down on the MeK and the leaders subsequent exile from Iran in 1981.

Hosseini also asserts that the "group of two or more individuals," he knew as the MeK and for whom he distributed literature between 1981 and 1985, were not engaged in terrorism and were distinct from the terrorist group that fled to Europe. This argument also fails. The flight of MeK leaders to Europe in 1981 did not preclude individuals in Iran, such as Hosseini, from continuing to support the group by distributing literature. Moreover, Hosseini repeatedly acknowledges in his affidavit that he distributed MeK literature. His affidavit shows a deep understanding of the history of the MeK, but at no point did he distinguish between the MeK that he distributed literature for in Iran and the broader MeK group. (*See* DE 21-1, at 136 ("I understand, from reading press reports since coming to the United States, that the MEK and other groups are alleged to have engaged in terrorist attacks on the Islamic government's leaders and supporters.")). Accordingly, USCIS's determination that the MeK was a Tier III terrorist organization was not arbitrary or capricious.

### 2. The Fedayeen Khalq

USCIS's determination that the FeK was a Tier III terrorist organization was based on reports in "widely available public sources" that show it "was originally an anti-Shah Marxist guerilla organization whose goal changed to overthrowing the Ayatollah after the Iranian revolution." (DE 21-1, at 3). Hosseini does not contest that the FeK was engaged in terrorist activities. Instead, he argues that the FeK split into three smaller groups and that he distributed fliers for the non-violent subgroup known as the Organization of Iranian People's Fedaian (Majority) (OIPFM). (DE 21-1, at 8). He bases this argument on a Canadian government document[10] which states that the OIPFM was the successor organization to the Organization of Iranian People's Fedaian Guerrillas (OIPFG). According to that report, the OIPFG believed "only armed struggle could put an end to 'the powerful American influence in Iran and the harsh repression against liberal dissidents' under the Shah's regime," but "[i]n 1981, following the Iranian Revolution, the OIPFG announced it was no longer in favour of guerrilla warfare and changed its name" to the OIPFM. Canada: Immigration and Refugee Board of Canada, *Iran: Information on the Organization of Iranian People's Fedaian (Majority) (OIPFM), Its Activities and Treatment of Its members and Supporters by Government Authorities*, Refworld (Sept. 24, 2003), http://www.refworld.org/docid/403dd1fa8.html (internal citations omitted).

Hosseini argues that USCIS decided, without evidence, that he was affiliated with the version of the FeK that engaged in terrorist activities from 1979 until 1981. But, as USCIS explained in its decision, Hosseini stated in his Form I-485 that he joined the FeK from 1979

---

[10] Hosseini argues that this document was not in the record, and therefore USCIS's determination that the FeK split did not occur until 1981 lacked evidence. Instead, he says the record evidence shows the FeK split began in 1977, during the last two years of the Pahlavi regime. The Court rejects this argument. Hosseini himself submitted the document into the record, citing it in his response to the Notice of Intent to Deny. (DE 21-1, at 8). While Hosseini also claimed in that response that the split began in 1977, he cited no evidence in support of that claim. (DE 21-1, at 9).

to 1982, and therefore he would have been affiliated with the OIPFG subgroup of the FeK while it was engaged in armed struggle and prior to its repudiation of those tactics and name change in 1981. (DE 21-1, at 5). Accordingly USCIS's determination that the FeK was a Tier III terrorist organization was not arbitrary or capricious.

*C. USCIS's determination that Hosseini did not present clear and convincing evidence of a lack of knowledge of the alleged terrorist activities was not arbitrary or capricious*

Hosseini's next argument is that he presented clear and convincing evidence showing that he did not know, and should not have known, that the MeK or FeK were engaged in terrorist activities. He points to his statements in his affidavit that he had no knowledge of either groups activities and claims that a lack of information in Iran at the time, combined with the Iranian governments misinformation campaign, were the reason he lacked knowledge of MeK and FeK terrorist activities.

An individual who provided material support to a Tier III terrorist organization is not inadmissible if he "can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). In *Daneshvar v. Ashcroft*, 355 F.3d 615 (6th Cir. 2004), the Sixth Circuit addressed this clear and convincing evidence standard and indicated certain types of evidence that may be relevant in determining an individual's state of mind.[11] These include: (1) the individuals age at the time he provided support; (2) length of time as a member or supporter; (3) the applicant's own statements about his knowledge; and (4) evidence that the applicant engaged in violent terrorist activities. *Id.* at 628.

---

[11] The immigrant in *Daneshvar* was challenging the Board of Immigration Appeal's determination that he was inadmissible pursuant to 8 U.S.C. § 1182(a)(3)(B)(vi)(IV)(cc) (soliciting funds or other things of value for a Tier III terrorist organization). Subsection (IV)(cc) and (VI)(dd) utilize the same standard, requiring the individual to "demonstrate by clear and convincing evidence that he did not know, and should not have reasonably known, that the organization was a terrorist organization."
§ 1182(a)(3)(B)(vi)(IV)(cc), (VI)(dd).

In its written opinion, USCIS considered Hosseini's statements regarding his lack of knowledge and determined that he did not meet his burden of showing, by clear and convincing, that he lacked knowledge under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Specifically, USCIS found that the "public and shocking nature of the violent activities of the FeK and MeK" made it unreasonable that Hosseini would not have known that they were engaged in terrorist activities. (DE 21-1, at 5). USCIS cited specifically to the 1981 bombing of the office of the Islamic Republic Party and Premier's office by the MeK that killed seventy high ranking Iranian officials. *Mujahedeen-e Khalq (MEK)*, Federation of American Scientists (July 13, 2004), http://fas.org/irp/world/para/mek.htm. This analysis was not arbitrary or capricious.

Hosseini argues that the factors relied on in *Daneshvar* compel a finding that he lacked knowledge. The *Daneshvar* factors do not support such a conclusion. The petitioner in *Daneshvar* was sixteen years old when he allegedly provide material support to the MeK. *Daneshvar*, 355 F.3d at 628. Hosseini, however, was an adult between the age of nineteen and twenty-five years old when he distributed MeK and FeK literature. While the petitioner in *Daneshvar* voluntarily dissociated from the MeK after one year, *id.*, Hosseini distributed literature for the MeK and FeK for approximately six years. And the affidavit of Hosseini's wife suggests that his dissociation was not the result of a voluntary repudiation of their methods or ideology, but rather the result of his wife's threats to leave him if he did not cease his political activities. (DE 21-1, at 125). While Hosseini's own statements about his knowledge support his argument, USCIS properly considered this evidence and found that it was inconsistent with the notoriety of the MeK and FeK's terrorist acts. Thus, the only factor from *Daneshvar* that weighs in Hosseini's favor is that he did not engage in violent acts. Under the deferential arbitrary and capricious standard, coupled with the fact that the

burden is on Hosseini to produce clear and convincing evidence of his lack of knowledge, that single factor is insufficient to overturn USCIS's determination.

*D. Distribution of FeK and MeK literature constituted "material support"*

Hosseini's final argument is that his actions—distributing literature and flyers over a six year period and providing copying and telefax services to facilitate that distribution—did not constitute "material support. He claims that distributing non-violent literature is *de minimis*, and would not have free up any organizational resources that could be put to violent ends.

The INS defines "engage in terrorist activity" to including committing "an act that . . . affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons . . . explosives, or training." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). The Sixth Circuit has not interpreted the term "material support" in the INS. The use of the word "including," however, suggests that the list of activities that qualify as material support is not exhaustive. *See Singh-Kaur v. Ashcroft*, 385 F.3d, 298 (3d Cir. 2004). The Supreme Court has addressed "material support" of terrorist organizations in the criminal context. *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (rejecting a vagueness challenge to the material support provision in 18 U.S.C. § 2339B(g)(4)). In *Holder*, the plaintiffs sought to "provide support for the humanitarian and political activities" of two FTOs "in the form of monetary contributions, other tangible aid, legal training, and political advocacy." *Id.* at 11. Rejecting their petition, the Supreme Court explained how non-violent support can further terrorist activities:

> Material support meant to "promot[e] peaceable, lawful conduct" . . . can further terrorism by foreign groups in multiple ways. 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks.

*Holder*, 561 U.S. at 30 (internal citations omitted). The Supreme Court also noted that "some designated foreign terrorist organizations use *social and political components* to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." *Id.* (emphasis added) (internal citations omitted) (internal quotation marks omitted). Thus, in *Holder*, the Supreme Court indicated that political advocacy, if coordinated with the foreign terrorist group, constitutes material support. *Id.*

In its written decision, USCIS determined that "[s]upport does not need to relate to the organization's terrorist actions in order to qualify as material support." (DE 21-1, at 3 (citing *S-K-*, 23 I & N Dec. 936, 943-44 (B.I.A 2006)). This decision was consistent with the interpretation of material support in *Holder* and not arbitrary or capricious. Distributing literature on behalf of the MeK and FeK, even if that literature promoted non-violent aims of the organization, would free up other resources within the groups that could be directed to violent activities. Moreover, non-violent political advocacy on behalf of the MeK and FeK would lend legitimacy to the groups that would indirectly promote their terrorist aims. Hosseini contends that his support was not "essential" and the actual value of his efforts may have been zero. This argument, however, relies on a tertiary definition of "material." *Material*, Black's Law Dictionary (10th ed. 2014); *see also Singh-Kaur*, 385 F.3d at 298 (The word 'material'. . . also means 'significant' or 'essential.'" (quoting *Material*, Black's Law Dictionary (7th ed. 1999)). The more relevant definition is "having some logical connection with the consequential facts." *Material*, Black's Law Dictionary (10th ed. 2014). Distributing literature, even if non-violent, on behalf of a terrorist group is material under that definition.

## IV. CONCLUSION

Because USCIS's denial of Hosseini's adjustment of status application was not arbitrary or capricious, the Court hereby **ORDERS** the following:

1. Plaintiff's Motion for Summary Judgement (DE 26) is **DENIED**;

2. the decision of USCIS denying Hosseini's adjustment of status application (DE 21-1, at 2-6) is **AFFIRMED**; and

3. a judgment consistent with this Opinion and Order will be entered contemporaneously.

Dated November 27, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY